**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **RANDY SCHOEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 21-00264-JB-N** |
| | ) | |
| **STATE FARM FIRE AND CASUALTY COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER**

A.    **Factual Background**

1.    In this action for alleged breach of a homeowner's insurance policy issued by Defendant State Farm Fire and Casualty Company ("State Farm") to the Plaintiff Randy Schoen ("Schoen"), State Farm has filed a motion, based on Fed. R. Civ. P. 702 and 703, to exclude the expert testimony of Plaintiff's designated expert, Darrell Steward, who has been identified as providing expert testimony regarding the reasonable and necessary costs to repair damages allegedly caused by Hurricane Sally to Schoen's insured premises (the "Property") (Doc. 28).  *See* Plaintiff's Expert Disclosures at page 2 (Doc. 28-1, PageID.199).  Schoen disclosed that Steward would testify as reflected on a two-page spreadsheet attached as Exhibit E to Plaintiff's expert disclosures (Doc. 28-1, PageID.203-205) (hereinafter the "Nielsen estimate").  His opinions included both the cost and scope of the repairs needed (Steward Deposition at 51:1-6, PageID.215).

2.    At his deposition, Steward testified that he did not prepare the Nielsen estimate (Darrell Steward Depo. at 42:6-24, Depo. Ex. 7) (Doc. 28-1, PageID.210, 311-312).  Nor did he

prepare a similar spreadsheet of costs of repair for the property of his brother Jerry Schoen who has also filed an action in this Court, Case No. 2021-265-JB-N (Id., Depo. Ex. 2) (Doc. 28-1, PageID.220-221). Both were prepared in their "entirety" by his estimator, Jay Nielsen, using a combination of Nielsen's own personal knowledge and some in-house information.  (Steward at 27:23-28:1, 29:5-7, 31:21-23, 42:6-24, 45:12-19, 77:23-78:6) (Doc. 28-1, PageID.208-210). Nielsen sent his estimate to Steward.  Without looking at the Property himself, Steward then called Nielsen to confirm that Nielsen felt good about the numbers on the estimate and then emailed that estimate to Schoen's counsel, Andrew York, without making any changes to it. (32:6-25, 77:20-78:9) (Doc. 28-1, PageID.209, 212).  York then produced the Nielsen estimate as part of Plaintiff's Expert Disclosures on February 11, 2022. (Doc. 19, Doc. 28-1, PageID.198-202). Nielsen was not disclosed as a testifying expert in those expert disclosures.

3.     Several weeks later, on March 3, 2022, 5 days before his deposition on March 8, Steward visited the Property for the first time, reviewing the information on Nielsen's estimate (Steward at 33:6-22, 78:7-9) (Doc. 28-1, PageID.209, 212)  Steward did not take any notes during his visit to the Property (39:11-12; 76:7-14) (Doc. 28-1, PageID.211, 213).  Any information he obtained during this walk-through did not impact the estimate prepared earlier by Nielsen and emailed to Schoen's counsel (33:16-22) (Doc. 28-1, PageID.209).  Steward made no changes to the Nielsen estimate as a result of his visit (45:20-22) (Doc. 28-1, PageID.210).

4.     Because most of the repairs had been completed at Schoen's Property before Nielsen or Steward ever visited the Property (Steward at 38:7-9) (Doc. 28-1, PageID.213), Nielsen used receipts produced by Schoen (Steward Depo. Ex. 5) (Doc. 28-1, PageID.251-310) and the public adjuster estimate prepared by NTX Claim Consulting (Steward Depo. Ex. 4) (Doc. 28-1,

PageID.222-250) to prepare his estimate   (Steward at 78:12-79:3) (Doc. 28-1, PageID.212).

Steward never compared the information in the receipts and the public adjuster estimate to

Nielsen's estimate to see if they matched up (Steward at 79:4-11) (Doc. 28-1, PageID.212).[1]

Steward did not believe Nielsen made any measurements but pulled them from the public

adjuster's report (Steward at 48:4-13) (Doc. 28-1, PageID.214).

5.      At his deposition, Steward was questioned about the Nielsen estimate, marked as

Exhibit 7, line item by line item (Doc. 28-1, PageID.208-214, 311-312).  As shown below, he

displayed little memory of the conditions of the Property, and little understanding of

fundamental aspects of the Nielsen estimate, including how costs were derived, and he admitted

that the estimate contained numerous errors, including items that were not damaged in the

hurricane.

a.      Steward did not know the meaning of some of the categories of

information shown on both the Jerry Schoen and Randy Schoen estimates by Nielsen, such as

the columns labelled "U.P.L.M." and "U.P.L." which are categories of some costs (Steward at

46:4–15; 77:20-22; Depo. Ex. 2 and Depo Ex. 7) (Doc. 28-1, PageID.214, 211, 220, 311).  He

confused the "QTY." (quantity) column with the cost of repairs (Steward at 51:24-52:7) (Doc. 28-

1, PageID.215).  He believed "MTLM." was an abbreviation for materials but testified that "I

don't know why [Nielsen] categorized it as MTLM, but that's the way he's got it characterized.  I

don't know." (Steward at 46:18-23, 77:20-22) (Doc. 28-1, PageID.214, 211).

---

[1] During the pendency of the claim, Schoen submitted an estimate prepared by NTX Claim Consulting but testified that it was riddled with inaccuracies (Deposition of Randy Schoen at 144:6-149:8) (Doc. 28-1, PageID.316-317). Schoen himself testified that the public adjuster's estimate was "over scoped" and rightfully caused State Farm to raise an eyebrow (Schoen at 195:2-14) (Doc. 28-1, PageID.318).

b.      The Nielsen estimate included the removal, replacement and painting of 75 linear feet of soffit and fascia (Doc. 28-1, PageID.311).  Steward did not know where that damage was located (Steward at 79:12-19) (Doc. 28-1, PageID.212).  The Nielsen estimate included painting two hundred square foot of "Fiber Board" (Doc. 28-1, PageID.311).  Steward did not know what that was referencing (80:1-12) (Doc. 28-1, PageID.212).  When asked whether the vinyl siding on the estimate was for the garage attached to the house or a second detached garage, Steward testified,  "I think this is the detached garage" (Steward at 80:13-15) (Doc. 28-1, PageID.212).

c.      The Nielsen estimate included the replacement of 60 feet of vinyl fence (Doc. 28-1, PageID.311).  Steward did not know where that fence was located (Steward at 80:24-9) (Doc. 28-1, PageID.212).  The estimate included replacement of 50 feet of wood fence (Doc. 28-1, PageID.322).  Asked where that fence was, Steward replied "I think it's in the back" (81:10-11) (Doc. 28-1, PageID.212).  As for the replacement of 225 feet of chain link fence in the estimate, Steward did not know if the entirety of the fence had been damaged or if certain sections could be replaced (Steward at 81:12-19) (Doc. 28-1, PageID.212).

d.      The Nielsen estimate contained the cost to repair a metal shop roof (Doc. 28-1, PageID.311).  Steward did not know if Nielsen measured the roof or used the information in the public adjuster's report (Steward at 83:6-22) (Doc. 28-1, PageID.216).  Steward did not look at the metal roof himself during his visit to the Property (Steward at 84:18-19) (Doc. 28-1, PageID.216) and when asked why the square footage of the metal roof to be replaced was different from the square footage of the ice and water shield that would go under it, he testified, "I have no idea." (Steward at 84:11-14) (Doc. 28-1, PageID.216).

e.      The Nielsen estimate included the installation of spray-in foam insulation in the attic (Doc. 28-1, PageID.311).  Steward did not know if Schoen had spray-in foam insulation in the attic before the storm (Steward at 84:20-25:2) (Doc. 28-1, PageID.216). In fact, Schoen had installed foam insulation only after the storm (Schoen at 142:13, 143:5) (Doc. 28-1, PageID.316).

f.      The Nielsen estimate included the removal and replacement of 70 linear feet of crown molding (Doc. 28-1, PageID.311).  Steward did not know where that measurement came from (Steward at 85:3-13) (Doc. 28-1, PageID.216).  As for the removal and replacement 800 square feet of wood flooring included in the estimate, Steward did not know: (1) how much of the house had wood flooring; (2) whether the flooring was hardwood or laminate – despite vouching for Nielsen's material cost; or (3) how much of the flooring was actually damaged (Steward at 85:14-86:3) (Doc. 28-1, PageID.216-217).  When asked whether he agreed with the testimony of Schoen's engineering expert, Martin Shields, that there were only two spots of minor warping that he identified in the flooring and both could be spot repaired, Steward testified "I don't know.  I've never seen it, so I don't know" (Steward at 86:4-10) (Doc. 28-1, PageID.217).

g.      Nielsen guessed the home was 1700 or 1800 square feet (Steward at 86:14-16) (Doc. 28-1, PageID.217).  The Nielsen estimate included installing 3,000 square feet of popcorn texture on the ceiling (Doc. 28-1, PageID.312).  When asked why there would be 3000 square feet of popcorn texture if the house was only 1700 square feet, Steward responded, "That's a good question" and changed his speculation as to the square footage of the house to 3000 square feet, admitting "I don't have an answer for that" (Steward at 86:21-23 87:1) (Doc. 28-1, PageID.217).  The estimate itself shows only 1500 square feet of drywall to be replaced

(Doc. 28-1, PageID.312), which Steward confirmed was for ceilings only.  (Steward at 87:13-17, PageID.217)

      h.     The Nielsen estimate included replacing the HVAC system and removing/installing 9 new light fixtures and 30 new wall outlets (Doc. 28-1, PageID.312).  Steward did not know what was wrong with the HVAC system other than what he was told (Steward at 88:9-18) (Doc. 28-1, PageID.217).   As for the electrical work, Steward testified that that information was probably pulled off the public adjuster's report (Steward at 89:3-15) (Doc. 28-1, PageID.217).

      i.     The Nielsen estimate included removing and replacing all drywall ceilings in the house, based on water staining.  (Doc. 28-1, PageID.312).  Steward agreed that not every water stain requires the entire sheetrock piece to be replaced; some water stains can be scraped, repainted and popcorn finish reapplied (Steward at 70:24-71:4; 106:3-14) (Doc. 28-1, PageID.218-219).  He did not test the integrity of the drywall where the staining was located since the ceiling had been replaced before his visit to the Property (87:2-12) (Doc. 218-1, PageID.217).  So, he agreed he could not testify as to whether painting would have been a possible fix, instead of replacing all the sheetrock (71:5-9) (Doc. 28-1, PageID.218).

      j.     At the hearing on the motion, State Farm's counsel pointed out that, on the Nielsen estimate for Randy Schoen's Property, the  house wrap to be installed underneath the vinyl siding on the garage was priced at"$25.00" per square foot for a total cost of $22,500 (Doc. 28-1, PageID.311).  This was an error in the placement of the decimal point, resulting in a hundred-fold inflation of the cost. The cost of house wrap on the Nielsen Estimate for his brother

Jerry's home was shown as $0.25 per square foot.  (Doc. 28-1, PageID.220).  See also NTX Claim Consulting estimate showing cost of house wrap as $0.29 per square foot (Doc. 28-1, PageID.238).

**B.**     **Motion to Strike Affidavits**

In opposition to State Farm's motion, Schoen filed affidavits of Darrell Steward, Spencer Cade and Jay Nielsen (Doc. 32-1, PageID.775-786).  In response, State Farm filed a motion to strike portions of the affidavit of Darrell Steward on the grounds that they contradicted his deposition testimony and to strike the entirety of the affidavits of Spence Cade and Jay Nielsen because they were never disclosed as witnesses (Doc. 36).

**1.**     **Affidavit of Darrell Steward**

In the Eleventh Circuit, a district court may "disregard an affidavit as a matter of law when, without explanation, it flatly contradicts his or her own  prior deposition testimony for the transparent purpose of creating a genuine issue of fact where none existed previously." *Furcron v. Mail Centers Plus, LLC*, 843 F. 3d 1295, 1306 (11th Cir. 2016).

For the reasons discussed below, the Court finds that the following language in the following paragraphs in Steward's affidavit contradict Mr. Steward's prior sworn testimony at his deposition with no adequate explanation for the conflict:

***a.***     ***Paragraph 14***

In paragraph 14 of Steward's affidavit, he testified that Spencer Cade had discussed with him "measurements" he had made and the "damages" he had observed at the time of his inspection (Doc. 32-1, ¶14, PageId.777).  When asked at his deposition what Cade said when he reported back, Steward testified:

> Q.     So Spencer goes out there. He reports back to you?
> A.     Right.

> Q.    And he tells you one brother has done some repairs, and
>         one brother hasn't done any repairs?
> A.    Correct.
> Q.    Did he tell you anything more specific than that?
> A.    Not really.
> Q.    Did he tell you the scope of the work or what was --
> A.    No.

(Steward at 27:11-22) (Doc. 28-1, PageID.208).  Schoen argues that Steward's response "not really" was simply that Cade did not tell him anything "more specific" about this one subject of one brother doing some repairs and another brother doing none, and that paragraph 14 of Steward's affidavit clarifies the entire conversation (Doc. 38, PageId.1118).  But the following question — "Did he tell you what the scope of work . . . was" — evoked a one-word response of "no," confirming that Steward had already described all that was discussed in his conversation with Cade.  If Cade had told him about "measurements" he made and "damages" he observed, that certainly fell within the question about "scope of work."  Paragraph 14 of his affidavit contradicts his deposition testimony in these respects.

Schoen also seeks to show that paragraph 14 is not inconsistent with his deposition testimony by referencing his testimony in response to a question about the measurements of Schoen's property that, "if I am not mistaken, he took the [measurements] from the [Public Adjuster]."  (Doc. 38, PageId.1118) (referencing Steward Depo. at 47:18-25).  Steward was referring to what Nielsen did, not what Cade did, and what Nielsen did on Jerry Schoen's, not Randy Schoen's, Property.  (Steward Depo at 47:17-48:13) (Doc. 38-1, PageID.1130).

Given this contradiction with the deposition testimony, the Court will disregard the statement in Paragraph 14 of Steward's affidavit that he discussed with Cade "the measurements, and the damages he observed at the time of his inspection."

### b.    Paragraph 20

In Paragraph 20 of Steward's affidavit he testified that, before sending the Nielsen's estimate to Schoen's lawyer, he "reviewed the estimate and the information contained within the estimate, reviewed the claim file material that was previously sent, verified the information within the construction estimate was correct and accurate, and then approved the estimate be sent to Mr. Schoen's representative." (Doc. 32-1, ¶20; PageID # 778). Steward does not identify what "claim file material" he reviewed, but presumably it included the "previous estimate prepared by NTX Public Adjusting" that he gave to Nielsen, according to Paragraph 15 of his affidavit. (Doc. 32-1, PageID.777). At his deposition, he was asked whether he had ever reviewed the public adjusters' reports on Schoen's and his brother Jerry's properties, before his inspection of those properties on March 3, 2022, which was several weeks after he had sent the estimate to Schoen's counsel. Steward testified " I just briefly looked at them" (Steward at 36:15-22) (Doc. 36-1, PageID.1096).

In response, Schoen argues that paragraph 20 of Steward's affidavit does not contradict his deposition testimony because he testified "I just briefly looked at them." (Doc. 38, PageID.1119). Whatever this "brief" look consisted of, it was not a "review" to "verify" the Nielsen estimate. Steward testified:

> Q.    Now, did you ever look at the public adjuster's report and confirm that any of the quantities that were being used matched up with what was in there?
>
> A.    No, sir, I didn't.

(Steward at 79:8-11) (Doc. 28-1, PageID.212)

To the extent the "claims file material" referenced in Steward's affidavit concerns the receipts received from Schoen that Steward gave to Nielsen, Steward similarly testified that he did not "verify" the Nielsen estimate using that information:

> Q.   So Exhibit 5 is the receipts and information that you were provided from Mr. York's firm regarding Randy Schoen. Did you provide that to Jay Nelson?
>
> A.   Yes.
>
> Q.   And did Jay Nelson, to your knowledge, use that information in helping formulate this estimate?
>
> A.   He referenced it.
>
> Q.   Have you ever gone back and cross-referenced it yourself to see if the numbers matched up with what was provided?
>
> A.   Not in depth.

(Steward at 78:22-79:7) (Doc. 28-1, PageID.212

The above-quoted deposition testimony shows Steward did not "verify" that the information in the Nielsen estimate was "correct and accurate," by comparing it to the public adjuster's report or by the receipts and information provided by Randy Schoen.  The Court will therefore disregard Steward's affidavit testimony that, before sending on the Nielsen estimate to Schoen's counsel, Steward "verified the information within the construction estimate was correct and accurate…."

### c.   Paragraph 21

At paragraph 21 of his affidavit, Steward testified that he inspected the Property with the Nielsen estimate in hand, and "verified that the information contained within the [Nielsen] estimate was correct and accurate." This testimony is inherently inconsistent with his deposition testimony, which demonstrated his complete inability to "verify" anything about the line items in the Nielsen estimate, as discussed above in the Factual Background.  For instance, he testified that he could not say whether the wood flooring had only a couple of minor spots of warping as opposed to the 800 square feet the Nielsen estimate called to be removed and replaced, because "I've never seen it, so I don't know."  Indeed, as he admitted at his deposition, the Nielsen estimate described a number of items that were not damaged in the hurricane.  And it contained some blatant errors on its face.  This affidavit testimony is also inconsistent with his deposition testimony, discussed above, that he never verified the Nielsen estimate against the public adjuster report or the receipts and information supplied by Randy Schoen, as to repairs previously performed, to see if they matched up.  The Court will therefore disregard the affidavit testimony of Steward, at Paragraph 21, that he "verified that the information contained within the [Nielsen] estimate was correct and accurate."

### 2.    Affidavits of Spencer Cade and Jay Nielsen

The two other affiants, Spencer Cade, and Jay Nielsen, employees of Steward Construction Company, were not identified by Schoen as a witness, expert or otherwise, in his initial disclosures or in any of his interrogatory responses.  (Doc. 36-1, PageID.1104-1114).

Fed. R. Civ. P. 26(a)(1)(A)(i) requires that each party make an initial disclosure of the name, address and telephone number of each individual likely to have discoverable information, along with the subjects of that information, that the disclosing party may use to support his claims or

defenses.   Rule 26(e) requires that these disclosures be supplemented as the litigation progresses.  Fed. R. Civ. P. 37(c)(1) states that if a party fails to identify a witness as required by Rule 26(a) or (e), that party may not be allowed to use that witness to supply evidence at a motion, at a hearing or any trial "unless the failure was substantially justified or his harmless."

Schoen argues that neither Cade nor Nielsen had any involvement in the case when the initial disclosures were served on State Farm (Doc. 38, PageID.1121).  But this does not excuse Schoen from supplementing his disclosures as required under Rule 26(e).  Schoen argues that his failure to supplement his disclosures was substantially justified and harmless because their identity and involvement were disclosed at Steward's deposition. (Doc. 38, PageID.1121). Whatever State Farm may have learned about these two individuals from Steward at his deposition, and the role they played in Steward's evaluation of the damages, it was not put on notice that they would testify in a manner inconsistent with Steward's description of their role at his deposition.  As discussed above, Steward testified that after looking at the properties of Randy and his brother Jerry Schoen, Cade did nothing more than report back to him that one had done repairs and the other had not. At a minimum, following Steward's deposition, counsel should have supplemented his disclosures to add them as witnesses, and address the subject of their testimony, before discovery cutoff. Schoen's failure to do so was neither substantially justified nor harmless.  The Court will disregard them for purposes of State Farm's motion to exclude.

## C.    Motion to Exclude Darrell Steward's Expert Testimony

Even if this Court were to consider the three affidavits filed by Schoen, they do not affect the conclusion of this Court that Darrell Steward  is merely serving as the "mouthpiece" for his estimator Jay Nielsen, who was never disclosed as an expert witness,  rather than expressing any

opinions of his own based upon reliable facts or data supplied by Mr. Nielsen.   His opinions

regarding the reasonable and necessary costs of repair are therefore inadmissible under Fed. R.

Civ. P. 703, as discussed below. His opinions are also inadmissible under Fed. R. Evid. 702 because

his conclusions are not sufficiently reliable under Daubert standards and his testimony will not

assist the trier of fact, as discussed below.

1.   **Rule 703**

Fed. R. Evid. 703 governs the permissible basis for an expert's opinion testimony and

provides:

> "An expert may base an opinion on facts or data in the case that
> the expert has been made aware of or personally observed.   If
> experts in a particular field would reasonably rely on those kinds of
> facts or data in forming an opinion on the subject, they need not
> be admissible for the opinion to be admitted.   But if the facts or
> data would otherwise be inadmissible, the proponent of the
> opinion may disclose them to the jury only if their probative value
> in helping the jury evaluate the opinion substantially outweighs
> their prejudicial effect."

Although Rule 703 permits experts, in some circumstances, to provide opinions based on

facts and data otherwise inadmissible in evidence, the Rule "is not an open door to all

inadmissible evidence disguised as expert opinion." *United States v. Scrima*, 819 F.2d 996, 1002

(11th Cir. 1987).   "[A] party cannot call an expert simply as a conduit for introducing hearsay under

the guise that the testifying expert used the hearsay as the basis of his testimony." *Indus. Eng'g*

*& Dev., Inc. v. Static Control Components, Inc.*, No. 8:12-CV-691-T-24-MAP, 2014 WL 4986482, at

*2 (M.D. Fla. Oct. 6, 2014) (quoting *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir.

2013)).   "If an expert simply parrots another individual's out-of-court statement, rather than

conveying an independent judgment that only incidentally discloses the statement to assist the

jury in evaluating the expert's opinion, then . . .the expert thereby becomes little more than a backdoor conduit for an otherwise inadmissible statement." *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, No. 3:19MD2885, 2021 WL 684183, at *2 (N.D. Fla. Feb. 11, 2021) (quoting *United States v. Pablo*, 696 F.3d 1280, 1288 (10th Cir. 2012)); *see La Gorce Palace Condo. Ass'n, Inc. v. Blackboard Specialty Ins. Co.*, 586 F. Supp. 3d 1300, 1307 (S.D. Fla. 2022) (A witness may not, "under the guise of giving expert testimony . . . [,] become the mouthpiece of the witness on whose statements or opinions the expert purports to base his opinion.") (quoting *Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 524 (5th Cir. 2013).

"Expert opinions ordinarily cannot be based upon the opinion of others whether those opinions are in evidence or not." *Am. Key Corp. v. Cole Nat. Corp.*, 762 F.2d 1569, 1580 (11th Cir. 1985). Rule 703 "does *not* permit an expert to 'simply repeat or adopt the findings of another expert without attempting to assess the validity of the opinions relied upon.' ". *La Gorce Palace Condominium Association, Inc.*, 586 F. Supp. 3d at 1306 (emphasis in original) (quoting *In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348, 1357 (N.D. Ga. 2000).  Although Rule 703 permits experts to rely on opinions of other experts in some circumstances, "the expert witness must in the end be giving his *own* opinion.  He cannot simply be a conduit for the opinion of an unproduced expert." *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 664 (S.D.N.Y. 2007) (emphasis in original); *see United States v. McLean*, 695 F. App'x 681, 685 (4th Cir. 2017) (absent an *independent opinion* based upon a reliable methodology, the expert is "little more than a conduit or transmitter for [] hearsay.") (emphasis added); *PODS Enterprises, Inc. v. U-Haul Int'l, Inc.*, No. 812CV01479T27MAP, 2014 WL 12628662, at *2 (M.D. Fla. July 2, 2014) (expert's references to another expert's surveys are inadmissible where expert "does nothing more than

parrot [the other expert's] findings and opinions, . . . ."); *Deutz Corp. v. City Light & Power, Inc.*, No. 1:05-CV-3113-GET, 2009 WL 2986415, at *6 (N.D. Ga. Mar. 21, 2009) (Rule 703 "does not permit an expert to simply parrot the opinions of other experts"); *Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1364 (S.D. Fla. 2009) ("While it is true that an expert's testimony may be formulated by the use of the facts, data and conclusions of other experts . . ., such expert must make some findings and not merely regurgitate another expert's opinion."); *In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 646, 653 (N.D. Ill. 2006) ("[O]ne expert cannot be the mouthpiece for another.");

In *Abrams v. Ciba Specialty Chemicals Corp.*, No. CIV.A. 08-0068-WS-B, 2010 WL 779283 (S.D. Ala. Mar. 2, 2010) (Steele, C. J.), Judge Steele recognized this rule against permitting experts to merely "parrot" the opinions of others as enjoying "broad acceptance among federal courts." *Id.* at *4 n. 9.

In *La Gorce Palace Condominium Association, Inc.*, 586 F. Supp. 3d 1300*,* a condominium association brought an action against an insurer alleging breach of a property insurance policy for failure to pay for damages in the wake of Hurricane Irma.  The insurer commissioned a team from Young & Associates to evaluate the claim.  That team prepared an Xactimate report valuing the plaintiff's claim and sent the insurer two iterations of its report, one in 2017 and a revised version in 2019.  *Id.*  at 1303.  The insurer disclosed Mr. Neal Morley, one of the members of the four-person team from Young & Associates, to provide expert testimony on the cost of the damage incurred during Irma.  *Id.* at 1304.  Mr. Morley had almost no role in preparing the Xactimate report; his conclusions relied heavily upon the Xactimate report prepared by another member of his team, Jake Belleavoine.  *Id.*  Mr. Morley did visit the site during the investigation, alongside

Mr. Belleavoine, who took notes from Mr. Morley.  But it was Mr. Belleavoine who came up with the input values and had Xactimate crunch the numbers.  The only thing Mr. Morley did was read the report and relay its conclusions.  *Id.*

In addressing the admissibility of the testimony of Morley and Belleavoine, the district court in *La Groce* noted that it had previously granted the plaintiff's *Daubert* motion to strike the testimony of Mr. Morley, on the basis that Morley's "[m]ere recitation of the major points from Mr. Bellavoine's report, without knowledge of how Mr. Bellavoine put the report together in the first instance, would not pass as expert testimony" Id. at 1304.  The court quoted the Seventh Circuit's comment that "[a]n expert who parrots an out-of-court statement is not giving expert testimony; he is a ventriloquist's dummy." *Id.* (quoting *United States v. Brownlee*, 744 F.3d 479, 482 (7th Cir. 2014)).

The court also ruled that Bellavoine was in the same position as Morley with respect to the additional valuations in the 2019 "revised" report that he did not prepare.  *Id.* at 1307. Belleavoine acknowledged his ignorance regarding the additional items for repair in the 2019 "revised" report that were not contained in the earlier report he prepared.  *Id.* The court concluded that if Mr. Belleavoine were to testify about the 2019 revisions, "he would be no different than Mr. Morley:  A mere 'mouthpiece' for someone else's out of court statements." *Id.* (citing *Factory Mut. Ins. Co.*, 705 F.3d at 524).  He would not be "sufficiently familiar with the reasoning or methodology behind the information to permit cross-examination." *Id.* (quoting *In re Polypropylene Carpet Antitrust Litigation*, 93 F. Supp. 2d at 1357).  Thus, plaintiff's motion to strike the testimony of Belleavoine was due to be granted with respect to the new material included in the revised report.  *Id.*

To find legal support for the admissibility of Steward's testimony, Schoen cites *Abrams*, 2010 WL 779283, for the principle that "an expert witness is permitted to use assistants in formulating his expert opinion, and normally they need not themselves testify." (Doc. 32, PageID.630) (citing *Abrams*, 2010 WL 779283, at *4) (quoting *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 612 (7th Cir. 2002)). Contrary to Schoen's claim that this was the "particular holding" in *Abrams* (Doc. 32, PageID.630 n.9), *Abrams* in fact found this principle not applicable, because the expert was acting as a "mere conduit" for another undisclosed expert. *Id.* at *4. The testifying expert, Dr. Zannetti, was "free to rely on information and data from an expert in formulating *his* opinions. However, at the end of the day, it is imperative that Dr. Zannetti apply *his knowledge* to the facts and form *his own opinion*." *Id.* (emphasis added). But in this case, he was "simply repeating" what the undisclosed expert had told him. *Id.* "Such bootstrapping of an undisclosed expert witness' opinions into the reports and testimony of another is plainly improper, where the disclosed expert is treating those opinions as his own (rather than simply relying on information from another expert as underlying data from which he formulates his own expert opinions)." *Id; see also United States v. Dukagjini*, 326 F.3d 45, 58 (2d Cir. 2003) (although an expert was permitted to "rely on hearsay evidence for the purposes of rendering an opinion based on his experience," in this case the government's expert was merely "repeating hearsay evidence without applying any expertise whatsoever, thereby enabling the government to circumvent the rules prohibiting hearsay)"; *United States v. O'Keefe*, 825 F.2d 314, 319 (11th Cir. 1987) (affirming district court's restriction of testimony of plaintiff's second tax expert which was "nothing more than a personal vouching of one expert for another expert."); *American Key Corp.*, 762 F.2d at 1580 ("Expert opinions ordinarily cannot be based upon the

opinions of others whether those opinions are in evidence or not."); *Grayson v. No Labels, Inc.*, No. 6:20-CV-1824-PGB-LHP, 2022 WL 1266218, at *5 (M.D. Fla. Apr. 25, 2022) ("An expert may not blindly rely on the conclusion of another expert and still meet the reliability requirements of Rule 702 and *Daubert*."); *Mchale v. Crown Equip. Corp.*, No. 8:19-CV-707-T-27SPF, 2021 WL 289346, at *3 (M.D. Fla. Jan. 28, 2021), *aff'd,* No. 21-14005, 2022 WL 4350702 (11th Cir. Sept. 20, 2022) ("Inappropriate parroting occurs when an expert adopts another expert's opinion wholesale, without reaching independent conclusions in reliance on that opinion.") (quoting *Fox v. Gen. Motors LLC*, No. 1:17-CV-209-MHC, 2019 WL 3483171, at *26 (N.D. Ga. Feb. 4, 2019)); *Hanson v. Colgate-Palmolive Co.*, 353 F. Supp. 3d 1273, 1292 (S.D. Ga. 2018) ("An expert 'may not simply repeat or adopt the findings of another expert without attempting to assess the validity of the opinions relied upon.' ") (quoting *Hernandez v. Crown Equip. Corp.*, 92 F. Supp. 3d 1325, 1352 (M.D. Ga. 2015)).

The proffered expert testimony of Darrell Steward, as to the reasonable and necessary costs of repair to Schoen's property, is inadmissible for precisely the same reasons that made Morley's and Belleavoine's testimony inadmissible in *La Gorce Palace Condominiums*.  He is simply serving as the mouthpiece for the findings and conclusions of his estimator, Jay Nielsen, who inspected the Property, apparently used information from the public adjuster's report and receipts supplied by Schoen, came up with the input values based on his judgment as to the scope of repairs needed, and generated a two-page spreadsheet of estimated repair costs.  This spreadsheet is inadmissible hearsay and not within any exception.  Schoen has not argued otherwise.

Rule 703 would permit Steward to form *his own* opinion, based upon any facts or data contained in this spreadsheet, if it contained the kind of facts or data that experts in his field would reasonably rely upon in forming their opinions. But the problem here is that Steward has *not formed any opinion of his own,* as to the necessary and reasonable costs of repair. He is simply serving as the mouthpiece of Nielsen who formed the judgments and opinions as to what those costs were in the Nielsen estimate disclosed as the basis of Steward's expert testimony. At the time his expert opinions were disclosed, with the Nielsen estimate disclosed as the basis for his opinions, Steward had not even visited the Property. His later inspection of the Property made no difference to his opinions based on the Nielsen estimate. His claim in his affidavit that he "verified" the Nielsen estimate by comparing it to the "claim file materials," before sending it to Schoen's counsel, is contradicted by his deposition testimony. But, in any event, whatever he did to "verify" that estimate, his deposition testimony does not reflect any opinions of his own but rather blind reliance upon the opinions in the Nielsen's estimate, without an independent opinion as to what repairs were needed or the costs of those repairs. He was clearly unfamiliar with how Nielsen determined the scope of repairs or the estimated costs of repair. He had no independent knowledge of those costs or even what some of the abbreviations used by Nielsen meant. Given Steward's deposition testimony, the only one who could be adequately cross-examined on the Nielsen estimate is Nielsen himself.

Even if Steward were providing any opinions of his own, based upon any information contained in the Nielsen estimate, this estimate is simply another estimator's opinions that Steward seeks to vouch for. This is impermissible. *See, e.g., O'Keefe,* 825 F. 2d at 319 (quoted *supra*); *Abrams,* 2010 WL 779283, at *4 (quoted *supra*); *PODS Enterprises, Inc.,* 2014 WL

12628662, at *2 (expert's reference to another expert's surveys in trademark infringement action was inadmissible where expert did nothing more than parrot the other expert's findings and opinions, suggesting they "corroborated" his own opinion that PODS is a well- known brand).

Finally, it is apparent from the testimony of Steward and other evidence described above, that the Nielsen estimate was so poorly prepared, and is so unreliable as an accurate assessment of the reasonable and necessary costs of repair, that no expert could reasonably have relied upon it as the basis for his own opinions. Under Rule 703, the inadmissible facts or data that form the basis of an expert's opinion must be the kinds of facts or data upon which an expert in his field would "reasonably" rely.   If the data underlying an expert's opinion is "so unreliable that no reasonable expert could base an opinion on them, the opinion resting on that data must be excluded." *In re TMI Litig.*, 193 F.3d 613, 697 (3d Cir. 1999), *amended,* 199 F.3d 158 (3d Cir. 2000). Steward admitted that the estimate was questionable, indeed erroneous, in numerous respects. The estimate includes the wrong type of insulation; flooring that, according to Schoen's engineering expert, does not need to be replaced; twice as much popcorn texture for the ceiling than actual ceiling square footage; and an error in the cost of house wrap by a hundred-fold. Further, Steward testified that the measurements and many other aspects of the estimate were not even Nielsen's work product, but instead pulled from a public adjuster's estimate that Schoen himself has acknowledged was inaccurate and over scoped (Schoen at 195:2-14) (Doc. 28-1, PageID.318).  It is dubious that the testimony of Nielsen himself, had he been identified as an expert, would have been admissible under Rules 702 and 703, given the unreliability of his findings and his reliance on an over-scoped public adjuster's estimate.

In summary, the Nielsen estimate that forms the basis for Steward's testimony is inadmissible hearsay; is the opinion of another individual, never disclosed as an expert, for whom Steward is being used as a mere conduit; and, in any event, is so unreliable that it cannot serve as the basis for anyone's testimony as to the reasonable and necessary costs of repair.  Steward is so unfamiliar with Nielsen's methodology and reasoning that he cannot be adequately cross-examined on that estimate.   For these reasons the motion to exclude his expert testimony is due to be granted under Rule 703.

  **2.**    **Rule 702**

Fed. R. Evid. 702, which governs expert testimony, provides:

> "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
>  (a) the expert's scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case."

Rule 702 requires district courts to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597 (1993).   This "gatekeeping" function is to be performed with regard to the admissibility of both expert scientific evidence and expert technical evidence. *United States v. Frazer,* 387 F.3d 1244, 1260 (11th Cir. 2004) (citing *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 147 (1999)).   "This function inherently requires the trial court to conduct an exacting analysis

of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702." *Id.*

Rule 702 requires district courts to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 597 (1993). This "gatekeeping" function is to be performed with regard to the admissibility of both expert scientific evidence and expert technical evidence. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (citing *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147 (1999)). "This function inherently requires the trial court to conduct an exacting analysis of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702." *Id.*

The Eleventh Circuit requires district courts to conduct a three-part inquiry to determine the admissibility of expert testimony:

> "(1) the expert [must be] qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions [must be] sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony [must assist] the trier of fact, through the application of scientific, technical or specialized expertise, to understand the evidence or to determine a fact in issue."

*Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1194 (11th Cir. 2010) (alternations added; citation omitted). The burden is on the proponent of the expert testimony to show, by a preponderance of the evidence, the testimony satisfies each part of this inquiry. *See Id.* (citation omitted).

Steward's testimony is also inadmissible under Rule 702 because his conclusions are not sufficiently reliable under *Daubert* standards and his testimony will not assist the trier of fact.

Merely adopting another expert's conclusions is not a methodology that satisfies *Daubert* standards. *Eberli,* 615 F. Supp. 2d at 1365; *see Bouygues Telecom. S.A. v. Tekelec,* 472 F. Supp. 2d 722, 729 (E. D. N.C. 2007) ("[T]he wholesale adoption of the opinion of another expert verbatim cannot be within the intent of Federal Rules of Evidence 702").  Further, expert testimony that "simply parrots the opinion of another does not assist the trier of fact, and thus, is inadmissible under Rule 702." *Robinson v. Ford Motor Co.,* 967 F. Supp. 482, 487 n.2 (M.D. Ala. 1997).

## <u>CONCLUSION</u>

For the reasons set forth above, State Farm's motion to exclude the expert testimony of Darrell Steward (Doc. 28) is hereby granted.

**DONE and ORDERED** this 1st day of November, 2022.

/s/ JEFFREY U. BEAVERSTOCK
CHIEF UNITED STATES DISTRICT JUDGE